# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| EMPIRE TODAY, LLC<br><br>       **Plaintiff,**<br><br>       v.<br><br>STEVE SILVERS, JUDD FELDMAN,<br>PIONEER ASSOCIATES, LLC,<br>COLORADO FUTURE ENTERPRISES,<br>LLC, HERITAGE TRUST, and RISK<br>PARTNERS, INC.<br><br>       **Defendants.** | )<br>)<br>)<br>)<br>)<br>)  **Case No.**<br>)<br>)  **Jury Demanded**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff, Empire Today, LLC ("Empire"), by its attorneys, complains of Defendants Steve Silvers ("Silvers"), Judd Feldman ("Feldman"), Pioneer Associates, LLC ("Pioneer"), Colorado Future Enterprises, LLC ("Colorado"), Heritage Trust ("Heritage"), and Risk Partners, Inc. ("Risk Partners") as follows:

## NATURE OF ACTION

This is an action for violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, breach of contract, breach of fiduciary duty, fraudulent misrepresentation and omission, tortious interference with fiduciary relationship, unjust enrichment, civil conspiracy, tortious interference with contract, and aiding and abetting fraud. Through this action, Empire seeks damages caused by a fraudulent scheme perpetrated by its former CEO (Silvers) and its former CFO (Feldman) (in concert with other Defendants) to divert to themselves more than $5 million in workers' compensation insurance refunds that should have been returned to Empire through its subcontractors. Through artifice, misrepresentation, and misuse of their positions within Empire, Silvers and Feldman, with the assistance of Risk Partners, concealed their refund-

diversion scheme from its inception in 2005 until August 2013, when their scheme was revealed to Empire following the initiation of a federal court action by an insurance carrier victimized by the scheme. Contrary to their fiduciary duty to act in the best interests of Empire, Silvers and Feldman enriched themselves over a multi-year period, to the substantial detriment of Empire. Empire seeks in excess of $25 million through this action.

During the time period relevant to this matter, Empire utilized three different subcontractors to perform installation work in California. Empire's arrangement with those subcontractors obligated Empire to pay the entire cost of workers' compensation insurance premiums incurred by those subcontractors, net of any subsequent adjustments or refunds from the applicable insurance carrier. Thus, Empire had a direct stake in the ultimate cost of workers' compensation premiums for its subcontractors.

The Empire subcontractors purchased retrospectively-rated workers' compensation insurance policies. Under a typical retrospective workers' compensation insurance policy, the insured pays initial premiums, which are based, among other things, on estimates of the total hours that will be worked by the covered employees during the policy period (i.e., the estimated payroll of the insured) and expected losses. Later, once actual payroll exposure and losses are known, the actual cost of coverage is calculated. When the initial premiums paid by the insured are greater than the actual cost of the coverage, the insured generally receives a refund for the overpayments. This arrangement allows the insured to benefit from maintaining a safe working environment—the insured receives cash refunds when it minimizes work-related injuries or the severity of such injuries, and, as a result, lowers the ultimate premiums for its workers' compensation insurance.

Through their scheme, Silvers and Feldman stole the cash refunds for workers' compensation premium overpayments that should have flowed from the insurer back to the insured subcontractors (and ultimately to Empire). With the assistance of Risk Partners as broker, Silvers and Feldman inserted Pioneer—an enterprise formed and controlled for the sole purpose of receiving purloined workers' compensation insurance refunds—as the beneficiary of refunds that should have been directed to Empire, the party that paid the original premiums. Furthermore, Silvers and Feldman unnecessarily and intentionally inflated the initial workers' compensation premiums paid by Empire, which, in turn, resulted in larger refunds for Pioneer to misappropriate.

Silvers and Feldman began their scheme in 2005 when, with the active assistance of Risk Partners, they established Pioneer as the holder of an interest in a "captive" insurance company associated with Arlington Insurance Company, a Bermuda-based entity, and arranged for that captive to reinsure Liberty Mutual Insurance Company's workers' compensation coverage for two Empire subcontractors. Captive insurance companies are ordinarily established by business entities so that those entities can gain certain tax and other business advantages. Here, in contrast, Silvers and Feldman—completely unbeknownst to Empire and without the consent of its Board of Managers—established a captive not to aid Empire but rather to obscure their diversion to Pioneer of sums that should have been returned to Empire.

In a later stage of their scheme, Silvers and Feldman ceased using the captive structure and instead arranged for retrospectively-rated workers' compensation insurance for certain Empire subcontractors through Manufacturer's Alliance Insurance Company ("MAICO"). When MAICO eventually issued refunds on these retrospective policies, Silvers and Feldman, again working in concert with Risk Partners, intervened to stop the refunds from flowing to the insured

subcontractors and ultimately to Empire.  Regardless of whether they were using the mechanism of a captive reinsurer (in the earlier years of their scheme) or using the insurance relationship with MAICO (in the later years of their scheme), the essential element of Silvers's and Feldman's scheme remained the same—they diverted to themselves, through Pioneer, money that was rightfully the property of Empire.

Silvers and Feldman knew that they were engaged in serious wrongdoing with respect to Empire and others, but they nevertheless continued their scheme for many years.  As the senior-most executives within Empire, Silvers and Feldman controlled the flow of information to others.  This fact, combined with affirmative misrepresentations by Silvers and Feldman and clandestine communications amongst the Defendants, allowed Silvers and Feldman to conceal their scheme from Empire for an extended period of time.

By their actions, Silvers and Feldman, in concert with the other Defendants, caused substantial injury to Empire that demands redress.  In addition to the over $5 million in insurance refunds misappropriated by Silvers and Feldman by conducting the affairs of Pioneer through a pattern of racketeering activity, Empire has been forced to spend over $1 million investigating and responding to this activity.  Thus, treble damages under RICO exceed $18 million. Furthermore, because Silvers and Feldman breached their fiduciary duties to Empire, Empire is entitled to receive, as a remedy, disgorgement of all remuneration earned by Silvers and Feldman throughout the inclusive time period during which Silvers and Feldman operated Pioneer to the detriment of Empire.  This remuneration exceeds $4 million for Silvers and $3 million for Feldman.  Thus, Empire's total claim in this matter exceeds $25 million.

## PARTIES

1.	Empire is engaged in the business of providing in-home and retail sales, installation, and service of carpeting, hard surface flooring, and window treatments to the residential and commercial marketplace.  Empire is headquartered at 333 Northwest Avenue, Northlake, Illinois.

2.	Silvers is the former Chief Executive Officer of Empire.  Silvers presently resides at 1014 Osterman Avenue, Deerfield, Illinois.

3.	Feldman is the former Chief Financial Officer of Empire.  Feldman resides at 1655 Orvieto Court, Pleasanton, California and also maintains a house at 550 Checker Drive, Buffalo Grove, Illinois.

4.	Pioneer is a West Virginia limited liability company with its principal place of business located at 1014 Osterman Avenue, Deerfield, Illinois (i.e., Silvers's residence).

5.	Colorado is a West Virginia limited liability company with its principal place of business located at 1014 Osterman Avenue, Deerfield, Illinois (i.e., Silvers's residence). Colorado is a member and manager of Pioneer.  Silvers and his wife are the members and managers of Colorado.

6.	Heritage is a trust that is beneficially owned, at least in part, by Feldman. Heritage is a member and manager of Pioneer.  Heritage has an address of 550 Checker Drive, Buffalo Grove, Illinois.

7.	Risk Partners is an insurance brokerage firm.  Risk Partners is a New Jersey corporation with its principal place of business at 709 Stokes Road, Suite 101, Medford, New Jersey.

8. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331, as this matter involves a federal question (specifically, a question under the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§1961-68). This Court has supplemental jurisdiction over the state law claims herein pursuant to 28 U.S.C. §1367 because the state law claims are so related to the claim for which this Court has original jurisdiction (the RICO claim) that they form part of the same case or controversy.

9. This Court has personal jurisdiction over Silvers because he resides in the State of Illinois. This Court has personal jurisdiction over Pioneer and Colorado because both Pioneer and Colorado have their principal place of business in the State of Illinois. This Court has personal jurisdiction over Heritage because, on information and belief, it is a trust established and maintained in the State of Illinois. Additionally, this Court has personal jurisdiction over Silvers, Feldman, Pioneer, Colorado, Heritage, and Risk Partners because they transacted business in this State and committed a tortious act within this State. Finally, this Court has personal jurisdiction over Silvers, Feldman, Colorado, Heritage, and Risk Partners pursuant to 18 U.S.C. §§1965(a)-(b).

10. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this District.

**FACTUAL BACKGROUND**

**Empire's Structure And The Employment Of Silvers and Feldman**

11. Empire is a limited liability company organized under the laws of the State of

Delaware. David Elenowitz, who resides and works in New York, is the Chairman of Empire's Board of Managers.

12. Empire Carpets, Inc. hired Silvers on September 8, 1997 as its Chief Financial Officer. Empire Home Services, LLC acquired substantially all of the assets of Empire Carpets, Inc. in 1998, and Silvers became Senior Vice President of Empire Home Services, LLC following the acquisition. As Senior Vice President, Silvers functioned as the senior-most executive officer of Empire Home Services, LLC, although he did not have the actual title of "Chief Executive Officer." In 2008, Empire Home Services, LLC changed its name to Empire Today, LLC. In May 2009, Silvers became Empire's Chief Executive Officer ("CEO").

13. Effective May 27, 2009, Empire and Silvers entered into a written employment agreement to memorialize the terms of Silvers's ongoing employment as CEO (the "Silvers Employment Agreement"). A true and correct copy of the Silvers Employment Agreement is attached as Exhibit 1.

14. Empire Home Services, LLC (now known as Empire Today, LLC) hired Feldman in January, 2004 as its Chief Financial Officer ("CFO").

15. Effective May 27, 2009, Empire and Feldman entered into a written employment agreement to memorialize the terms of Feldman's ongoing employment as CFO (the "Feldman Employment Agreement"). A true and correct copy of the Feldman Employment Agreement is attached as Exhibit 2.

16. As part of their duties as CEO and CFO, respectively, Silvers and Feldman had authority over the conduct of Empire's business, including the disbursement of funds.

**Empire's California Operations And Its Role In
Workers' Compensation Insurance Obtained By Its Subcontractors**

17. Empire contracts with independent contractors to install in customers' homes carpet, hard surfaces flooring, and window treatments offered by Empire.

18. As part of its business operations in the State of California, Empire contracted with various entities at different points in time to provide installation services to customers. Since mid-2010, Empire has contracted with Carpet Workshop, LLC, a subsidiary of Empire. Prior to mid-2010, Empire contracted with three different, unaffiliated entities: Carpet Workshop California, Inc. ("Carpet Workshop"), CA West Flooring, Inc. ("CA West"), and Flooring Install, Inc. ("Flooring Install") (Carpet Workshop, CA West, and Flooring Install are collectively referred to hereafter as the "Empire Contractors"). The Empire Contractors in turn utilized their own employees or contracted with their own subcontractors to complete installation work contracted by Empire. The Empire Contractors were obligated to obtain workers' compensation insurance coverage on behalf of their employees and certain subcontractors.

19. As part of its business arrangement with the Empire Contractors, Empire provided management services for the Empire Contractors and also agreed to compensate the Empire Contractors for certain expenses incurred by the Empire Contractors, including the cost of workers' compensation insurance premiums incurred by those entities for coverage primarily in the State of California for their employees and certain subcontractors (collectively, "Installers"). The Empire Contractors invoiced Empire for the weekly cost of payments to their Installers for installation of Empire's products for customers. In addition to paying the Empire Contractors for those weekly invoices, Empire paid the Empire Contractors an additional percentage on top of those weekly invoices. This additional percentage fluctuated from time to time and was

designed to cover other expenses of the Empire Contractors, including the comprehensive cost of workers' compensation insurance coverage for the Empire Contractors.

20. Thus, through its arrangement with the Empire Contractors, Empire was directly responsible, on a dollar-for-dollar basis, for all workers' compensation insurance premiums ultimately incurred by the Empire Contractors. A reduction in the cost of workers' compensation premiums incurred by the Empire Contractors would therefore have, dollar-for-dollar, reduced Empire's payments to the Empire Contractors (by reducing the fluctuating expense percentage described above).

21. During the relevant time period, Silvers was one of the persons who principally provided management services to the Empire Contractors. Additionally, Silvers served as a director of each of the Empire Contractors during at least portions of the relevant time period. Silvers was therefore personally involved in the process by which Empire paid workers' compensation premiums on behalf of the Empire Contractors.

22. The Empire Contractors purchased retrospectively-rated workers' compensation insurance policies. A retrospective policy generally requires the insured to provide an initial estimate of its anticipated payroll for the pertinent year (i.e., an estimate based on the anticipated number of potential claimants, their expected hours of work, and their job classifications). The insured then pays to the insurer initial premiums for workers' compensation insurance coverage for the applicable year based on this estimated payroll and expected losses. At a later point, when the actual payroll exposure and losses are known, the insurer conducts an audit and retrospective adjustments, which results in adjustments to the premiums for the pertinent year. If the audit and retrospective adjustments reveal that the insured overpaid for coverage (because the

estimated payment was greater than the actual cost of coverage for that year based on actual payroll exposure and losses), the insurer refunds the premium overpayment to the insured.

23. Carpet Workshop and CA West purchased workers' compensation insurance from Liberty Mutual Insurance Company[1] beginning in 2005. Later, CA West purchased workers' compensation insurance from MAICO, as did Flooring Install.

24. To the extent that the applicable insurer would, based on the subsequent audit and retrospective adjustments, adjust downward the workers' compensation policy premiums paid by the Empire Contractors (i.e., pay refunds for premium overpayments), the Empire Contractors, as the insured entities, were entitled to receive such refunds. Then, based on the arrangement with Empire, the Empire Contractors would credit or remit such refunds back to Empire—the source of the funds for the initial premium payments. Thus, any refunds that were due to be paid to the Empire Contractors by the applicable insurers for workers' compensation premium overpayments were the property of Empire—the source of the original premium payments.

25. Between 2005 and 2010, Empire paid to the Empire Contractors more than $9.8 million to cover workers' compensation insurance premiums for the Empire Contractors.

**Empire Learns That, For Multiple Years,
Silvers and Feldman Diverted To Themselves
Insurance Premium Refunds That Were Due To Be Paid To Empire**

26. On July 25, 2013, Manufacturers Alliance Insurance Company ("MAICO") filed suit in the United States District Court for the Northern District of Illinois against CA West, Flooring Install, Empire, and Pioneer (Case No. 13-cv-5309) (the "MAICO Complaint"). A true and correct copy of the MAICO Complaint (without its exhibits) is attached as Exhibit 3.

---

[1] Some of the applicable policies were with Employers Insurance Company of Wausau, which is part of the Liberty Mutual Group.

27.     The MAICO Complaint alleged, among other things, that CA West and Flooring Install were due premium credits in the amount of $619,833.60 under certain retrospectively-rated insurance policies issued to them but that, upon the direction of Silvers, MAICO wired the funds for these credits not to CA West or Flooring Install (the entities that paid the premiums to MAICO based on amounts received by them from Empire), but rather to Pioneer.  (Exh. 3, ¶1).

28.     The MAICO Complaint further alleged that Pioneer was part of a corporate shell-game by Silvers and Feldman designed to deceive MAICO and to prevent it from recovering sums owed by CA West and Flooring Install based on subsequent retrospective adjustments by MAICO.  The MAICO Complaint alleged that MAICO had sustained more than $1.5 million in losses as a result of Silvers's and Feldman's actions.  (Exh. 3, ¶¶1, 56-66).

29.     Upon receiving the MAICO Complaint, Empire commenced an independent investigation into the matters alleged by MAICO, particularly the allegation that money that should have been refunded to CA West and Flooring Install and ultimately to Empire was channeled at Silvers's direction to Pioneer, an entity previously unknown to Empire's Board of Managers, Empire's in-house legal counsel, and Empire's management (outside of Silvers and Feldman themselves).

30.     A Special Committee of Empire's Board of Managers hired the law firm of Mayer Brown to conduct the investigation.  As part of its investigation, Mayer Brown attorneys interviewed numerous witnesses, including Silvers and Feldman, and reviewed voluminous documentation.  The documentation revealed the following facts:

        a.      That Colorado (owned by Silvers and his wife) and Heritage (owned, at least in part, by Feldman) were the sole members of Pioneer and that Silvers and Feldman formed Pioneer in West Virginia in 2005 and had operated it ever since (see true and correct copies of West Virginia corporate records pertaining to Pioneer and Colorado attached as Exhibits 4 and 5);

b.    That Silvers and Feldman provided the estimated payroll data for the Empire Contractors and that this estimated payroll data was then used to compute the initial workers' compensation premiums paid by Empire through the Empire Contractors;

c.    That Empire paid for expenses of the Empire Contractors, including the cost of workers' compensation premiums;

d.    That, with one exception,[2] neither Empire nor the Empire Contractors received any refunds for workers' compensation premium overpayments by the Empire Contractors for Liberty Mutual/MAICO policies covering the years 2005, 2006, 2007, 2008, 2009, and 2010;

e.    That Silvers and Feldman directed Risk Partners to deposit refunds for workers' compensation premium overpayments into a bank account in the name of Pioneer, rather than having the money returned to the Empire Contractors and ultimately back to Empire;

f.    That upon deposit of funds into Pioneer's bank account, Silvers and Feldman disbursed the funds to Colorado and Heritage, ultimately for the personal benefit of Silvers and Feldman;

g.    That Silvers and Feldman concealed their scheme from Empire's Board of Managers, legal counsel, and other management until it was revealed in the follow-up to the MAICO Complaint in August 2013 (concealment that included, among other things, an affirmative misrepresentation by Silvers to Empire's Controller in September 2011); and

h.    That, in total, over $5.1 million in insurance-related refunds were channeled to Pioneer instead of being directed back to Empire via the Empire Contractors.

31.    After hearing the investigatory findings from Mayer Brown, Empire terminated Silvers's employment on September 9, 2013 for "Cause" under the Silvers Employment Agreement—i.e., due to his "willful misconduct that has a material adverse effect on the Company." (Exh. 1, ¶7(f)(1)(iii)).

32.    Feldman had previously resigned from his employment with Empire on June 27, 2011—prior to the revelation of his scheme with Silvers to defraud Empire.

---

[2]    The one exception was a duplicate premium payment that was returned to CA West.

33. On October 9, 2013, MAICO voluntarily dismissed the MAICO Complaint with prejudice as to Empire and all other defendants. On information and belief, Pioneer paid more than $1 million dollars to MAICO in settlement of MAICO's claims against Pioneer. Empire did not provide consideration to MAICO in exchange for the dismissal of Empire with prejudice.

**Silvers and Feldman Engaged In A Scheme Beginning In 2005
To Defraud Empire of Millions Of Dollars**

34. Silvers and Feldman initiated their fraudulent scheme in 2005. Silvers and Feldman actively profited from the ongoing scheme through at least October 2011. From the scheme's inception until its discovery in August 2013, Silvers and Feldman, through artifice, deception, and misrepresentation, fraudulently concealed the scheme from other Empire management and Empire's Board of Managers. As the senior-most executives within Empire, Silvers and Feldman had the ability to control the flow of information to others and thus could conceal their scheme for an extended period of time.

**The Scheme Begins With The Creation Of Pioneer and
The Engagement of a "Captive" Insurance Company**

35. In or around mid-2005, Silvers and Feldman, working through and with Risk Partners and its Executive Vice President Ron Hodge in New Jersey, began efforts to acquire workers' compensation insurance for Carpet Workshop through Liberty Mutual Insurance Company. As with many transactions related to the scheme described herein, Silvers communicated with Hodge via e-mail using a personal e-mail account (stevesilvers@comcast.net) rather than through his Empire work e-mail account.

36. Silvers and Feldman often communicated with Risk Partners via personal e-mail accounts, and one or more meetings between Risk Partners and Silvers/Feldman occurred away from Empire's premises. This communication outside of normal Empire channels was part of

the efforts of Silvers and Feldman to conceal their activities from Empire. Risk Partners knew that Silvers and Feldman were officers of Empire but knowingly engaged in communications with them outside of Empire's normal channels of business communication.

37. In or around September 2005, Silvers and Feldman formed Pioneer under West Virginia law and established Colorado and Heritage as Pioneer's members. Silvers and Feldman formed Pioneer as the enterprise for defrauding Empire of workers' compensation premium refunds to which it was entitled.

38. Pioneer had no apparent business purpose other than as a vehicle through which Silvers and Feldman would divert workers' compensation premium refunds away from Empire.

39. Without the knowledge or consent of Empire's Board of Managers, Silvers and Feldman, acting through Pioneer, established Pioneer as the beneficial owner of an interest in a "captive" insurance company associated with Arlington Insurance Company ("Arlington"), a Bermuda-based entity. The "captive" was set up as a separate "cell" through Arlington, and the captive Arlington cell, in association with Liberty Mutual Insurance Company, reinsured Liberty Mutual workers' compensation policies for Carpet Workshop and later CA West.[3] The captive cell was funded, in material part, by workers' compensation premiums paid by Empire through Carpet Workshop and CA West.

40. Ultimately, Pioneer, as the owner of the captive, withdrew the funds held by the captive—including the funds that flowed to the captive based on premiums originally paid by Empire.

41. Captive insurance companies are ordinarily established by business entities so that those entities can gain certain tax and other business advantages. In this case, however, Silvers

---

[3] Liberty Mutual (a/k/a Wausau) was the licensed insurer that provided direct coverage to the insured entities.

and Feldman utilized the concept of a captive insurance company as a mechanism to defraud Empire, not to further Empire's business interests. They inserted Pioneer as the beneficiary of the sums held by the captive, to Empire's detriment.

42. Silvers and Feldman, directly and through Pioneer, participated on both sides of the captive transaction—a clear conflict of interest, among other things. Silvers approved payments by Empire to Carpet Workshop and CA West for workers' compensation premiums. Then, in his role as a principal provider of management services to Carpet Workshop and CA West, Silvers signed checks payable to Liberty Mutual for the workers' compensation coverage reinsured by the captive. Some of these premium payments were deposited into the captive reinsurer—but hidden from Empire. This money was ultimately diverted to Pioneer and then paid to Silvers and Feldman personally through Colorado and Heritage.

**Silvers and Feldman Begin Receiving Money From The Captive Insurance Company Via Pioneer; Later, Silvers And Feldman Disengage The Captive And Begin Obtaining Insurance For Empire Contractors Through MAICO But Nevertheless Continue Their Refund-Diversion Scheme**

43. The refund-diversion scheme orchestrated by Silvers and Feldman, in conjunction with the other Defendants, initially utilized the Arlington "captive" to channel workers' compensation premium overpayments to Pioneer. Had Silvers and Feldman been acting in Empire's interests, they would have ensured that any sums retained in the captive reinsurer were returned to Empire—the original source of the workers' compensation premium payments and the employer to whom Silvers and Feldman owed a fiduciary duty of loyalty. Instead, Silvers and Feldman directed all such monies to Pioneer—and then Colorado and Heritage—for their personal benefit.

44. Silvers and Feldman made an initial capital contribution to the captive through Pioneer. However, on information and belief, this capital was never truly at risk because Silvers

and Feldman manipulated the up-front premiums paid by Empire to ensure that those premiums were substantially in excess of estimated losses. Furthermore, on information and belief, Silvers and Feldman set the threshold at which the captive reinsurer would be liable for losses at an excessively high level to avoid risking their capital.

45. Silvers's and Feldman's activities relative to the captive reveal their recognition of their wrongdoing and their concomitant need to keep their behavior hidden from Empire.

46. In November 2006, Silvers sent a facsimile to Liberty Mutual Insurance Company in Pennsylvania using letterhead ostensibly for Carpet Workshop, but with Silvers's home address of 120 Doral Court, Deerfield, Illinois rather than Carpet Workshop's actual business address of 333 Northwest Avenue, Northlake, Illinois. In the facsimile containing the phony letterhead, Silvers requested that Liberty Mutual not pay Carpet Workshop for a workers' compensation premium refund but instead retain the sums "in the captive." A true and correct copy of this facsimile is attached as Exhibit 6. Because Pioneer owned the captive, this ensured that Pioneer would ultimately be enriched by the funds that should have been returned to Carpet Workshop.

47. Silvers used fake letterhead for Carpet Workshop (with his home address instead of Carpet Workshop's actual business address) in an attempt to ensure that any return correspondence from Liberty Mutual would not be viewed by other Empire personnel.

48. Effective December 1, 2007, workers' compensation insurance coverage for CA West was provided by MAICO, and Silvers and Feldman took steps to wind-down the captive that had been established in association with Arlington.

49. The arrangement by which MAICO provided insurance coverage did not use the concept of a "captive." Rather, the MAICO policies were straightforward retrospectively-rated

policies wherein the insured would receive refunds directly from MAICO if the initial premium payments exceeded the actual exposure and losses. Silvers and Feldman, however, working in concert with Risk Partners, instructed MAICO to deliver workers' compensation premium refunds to Pioneer, depriving the insured—and ultimately Empire—of the value of those refunds.

50. Silvers and Feldman intentionally and unnecessarily inflated the payroll estimates of the Empire Contractors provided to MAICO. This resulted in larger initial premium overpayments and larger refunds—and thus more money wrongfully diverted to Pioneer. Furthermore, Silvers and Feldman arranged for coverage from MAICO using a voluntarily-elected Loss Development Factor ("LDF"), a factor which resulted in greater up-front premium payments and thus greater potential for refunds.

51. Although MAICO provided workers' compensation coverage for CA West from December 1, 2007 onward, significant sums of money were still held in the Arlington "captive" that would eventually be paid to Pioneer after this date.

52. In March 2008, Silvers and Feldman sent a facsimile to Arlington in Bermuda using Pioneer letterhead with an address of 1014 Osterman Ave., Deerfield, Illinois (Silvers's home address at the time). In the facsimile, Silvers and Feldman requested a release of capital in the "Pioneer cell" (the captive) in the amount of $350,000. A true and correct copy of this facsimile is attached as Exhibit 7. On information and belief, this release of capital was made possible because of workers' compensation insurance premiums overpaid by Carpet Workshop and CA West (and ultimately Empire) and retained in the captive controlled by Pioneer.

53. In August 2008, Silvers and Feldman sent a letter on Pioneer letterhead via mail, fax, or e-mail to Arlington in Bermuda. In the letter, Silvers and Feldman requested a dividend from the captive insurance company on the Liberty Mutual/Arlington policies for the 2005/2006

and 2006/2007 program years.  A true and correct copy of this letter is attached as Exhibit 8.  On information and belief, the dividend payment was possible because of workers' compensation premium overpayments by Carpet Workshop and/or CA West.

54.     In November 2008, Silvers sent another letter to Liberty Mutual Insurance Company using letterhead ostensibly for CA West but with an address of Silvers's residence in Deerfield, Illinois as opposed to CA West's business address.  A true and correct copy of this letter is attached as Exhibit 9.  This letter dealt with workers' compensation insurance claims by CA West.

55.     In January 2009, Silvers sent a letter to Arlington directing that any amounts distributed as a result of the Carpet Workshop workers' compensation policy "should be made through Pioneer Associates."  A true and correct copy of this letter is attached as Exhibit 10. This was a direct request by Silvers to have Arlington divert refunds to Pioneer instead of returning those refunds to the proper party (Carpet Workshop and ultimately Empire).

56.     In March 2009, Feldman received a request for audit information from MAICO through his personal e-mail account.  In an e-mail to Silvers on March 28, 2009, Feldman forwarded the audit request to Silvers with the following instruction: "PLEASE DO NOT FORWARD AS HE SENT THIS TO MY PERSONAL EMAIL ADDRESS."  A true and correct copy of this e-mail is attached as Exhibit 11.  Feldman made this statement because he knew that he and Silvers were engaged in wrongdoing, and forwarding the e-mail may have resulted in other Empire personnel being alerted to the transactions ostensibly on behalf of CA West, but for his personal benefit and to Empire's detriment.

57.     In May 2009, Silvers, with copy to Feldman, communicated with Simon Hothersall of Liberty Mutual Management (Bermuda) Limited via e-mail seeking distributions to

Pioneer of sums held by the captive (sums that ultimately should have been refunded to Empire via Carpet Workshop or CA West). A true and correct copy of Silvers's e-mail is attached as Exhibit 12.

58. In late 2009 or early 2010, Empire began using Flooring Install as a California subcontractor, and Silvers and Feldman arranged for workers' compensation insurance coverage for Flooring Install through MAICO in a similar manner to what they had previously done for CA West.

59. On April 8, 2010, Silvers, on behalf of Pioneer, sent a letter (via regular mail or e-mail) to Liberty Mutual/Arlington requesting a commutation of the captive cell. A true and correct copy of this letter is attached as Exhibit 13. This commutation allowed Silvers and Feldman to misappropriate, through Pioneer, the workers' compensation premium overpayments that had been retained in the captive. Later, on May 7, 2010 and June 1, 2010, Feldman, on behalf of Pioneer, sent letters to Arlington (via regular mail or e-mail) for the purpose of arranging for a payout to Pioneer from the captive cell. True and correct copies of the May 7 and June 1 letters are attached as Exhibits 14 and 15, respectively.

60. On July 16, 2010, Silvers, through his personal e-mail account (stevesilvers@att.net), received confirmation that $1.7 million would be paid to the shareholder of the captive insurance cell (i.e., Pioneer). A true and correct copy of this e-mail is attached as Exhibit 16. The money referenced in the e-mail was eventually wired to Pioneer. Silvers notified Feldman of this payment via e-mail. (Exh. 16).

61. Silvers and Feldman continued to steal workers' compensation premium overpayments even after the Arlington captive was terminated. Silvers and Feldman continued

to use Pioneer as the vehicle to misappropriate workers' compensation premium refunds paid by MAICO.

62.     Throughout the time that MAICO was providing workers' compensation insurance coverage for CA West and Flooring Install, MAICO periodically sent premium refunds intended for these entities to Risk Partners. Risk Partners diverted those refunds to Pioneer instead of providing them to CA West and Flooring Install. At other times, Silvers and/or Feldman arranged for MAICO to send refunds directly to Pioneer.

63.     On October 4, 2011, Silvers provided wire transfer information for Pioneer's Chase bank account in Deerfield, Illinois via e-mail to Sandi Funk of PMA Group (part of MAICO). A true and correct copy (redacted) of this e-mail is attached as Exhibit 17. Silvers provided this information so that Funk could wire refunds to Pioneer (refunds that should have been paid to Empire via CA West or Flooring Install).

64.     Net of capital that Silvers and Feldman deposited into Pioneer for distribution to the captive insurance company, Pioneer received, in total, more than $5.1 million in insurance-related refunds that should have been delivered to Empire via the Empire Contractors. Pioneer distributed that money to Colorado and Heritage for ultimate distribution to Silvers and Feldman.

65.     Silvers and Feldman contributed to the captive through Pioneer a total of $800,000 in capital. Pioneer received the following sums from either the captive or from MAICO (sometimes directly and sometimes through Risk Partners): (a) $350,000 on April 1, 2008; (b) $300,000 on July 17, 2008; (c) $386,909 on December 9, 2008; (d) $498,335 on July 14, 2009; (e) $100,000 on July 22, 2009; (f) $729,167 on September 10, 2009; (g) $556,398.90 on December 21, 2009; (h) $100,000 on March 17, 2010; (i) $47,291 on March 19, 2010; (j) $100,000 on March 22, 2010; (k) $1,702,306 on July 22, 2010; (l) $353,311.60 on September 3,

2010; (m) $196,167.40 on September 9, 2010; (n) $250,000 on December 17, 2010; and (o)

$262,522 on October 14, 2011.

**Silvers Falsely Denies Any Related Party
Transactions As Part Of A Senior Secured Note Offering By Empire**

66.     During the pendency of Silvers's and Feldman's scheme, Empire initiated a senior

secured note offering.  As part of the note offering process, Silvers and Feldman were required to

complete a Directors and Officers questionnaire ("D&O Questionnaire").

67.     The D&O Questionnaire required, among other things, that Silvers and Feldman

identify any interest they had in any "related person transactions," defined as any transaction,

arrangement, or relationship exceeding $120,000 in which Empire or any subsidiary is or was a

participant and in which the disclosing party (here, Silvers and Feldman) has a direct or indirect

interest.  Silvers and Feldman intentionally failed to disclose their interest in Pioneer, an entity

that was involved in an arrangement wherein it profited from workers' compensation insurance

provided to the Empire Contractors (and funded by Empire).  True and correct copies of the

Silvers and Feldman D&O Questionnaires are attached as Exhibits 18 and 19, respectively.

Empire relied on Silvers's and Feldman's representations from the D&O Questionnaires in

preparing its Offering Memorandum to potential investors of the notes.

**Silvers and Feldman Actively Concealed Their Scheme From Empire**

68.     Knowing that they were engaged in wrongdoing, Silvers and Feldman concealed

Pioneer from Empire and its Board of Managers, from the time of Pioneer's creation in 2005

through Empire's assessment of the MAICO Complaint in August 2013.  For example:

> a.      Silvers and Feldman formed Pioneer in West Virginia (as opposed to
> Illinois, where Silvers and Feldman reside) in an effort to limit possible
> discovery by Empire, its Board of Managers, or others;

- 21 -

b. Silvers and Feldman often engaged in communications with regard to Pioneer through personal e-mail accounts rather than through their Empire work e-mail accounts; and

c. Notwithstanding the fact that Silvers and Feldman had engaged a captive insurance company for their own benefit in 2005, Silvers responded to an inquiry from the Chairman of Empire's Board of Managers, David Elenowitz, in December 2005 disparaging the idea of utilizing a captive insurance company (an e-mail that implied that no captive company had ever been engaged related to workers' compensation insurance for the Empire Contractors). A true and correct copy of this e-mail is attached as Exhibit 20.

69. In order to ensure that their scheme evaded detection by other personnel of Empire, Silvers and Feldman used their positions as CEO and CFO to deny other Empire personnel access to information regarding workers' compensation issues in California. For example, in a June 23, 2006 e-mail to certain Empire personnel who had reason to interact with the Empire Contractors and workers' compensation issues, Silvers stated:

> As I have mentioned in the past the issues in California are very tricky and *I am the only person to address*. . . . [S]o in the future if anyone in (sic) brings up the issues of workers compensation coverage (questions, claims, ANYTHING) in California please just send me the e-mail and I will address. I will handle from here.

(Emphasis added). A true and correct copy of this e-mail is attached as Exhibit 21. Knowing that he and Feldman were engaged in wrongdoing, Silvers used the pretext of California issues being "tricky" and his power as chief executive to preclude subordinate personnel at Empire from potentially asking questions about activity with respect to workers' compensation insurance in California.

70. Similarly, in May 2007, Silvers stated in an e-mail to Scott Bergfors, an Empire manager: "Any questions on California should come to *me only*. *People only need to know we have proper insurance and leave the rest to me*." (Emphasis added). A true and correct copy of

this e-mail is attached as Exhibit 22.  Silvers created and sent this e-mail in furtherance of his efforts to conceal his scheme with Feldman to defraud Empire through Pioneer.

71.	As a further element of concealment, Silvers hid from other Empire personnel the fact that any workers' compensation premium refunds had occurred.  For example:

a.	In January 2009, Empire Controller Bill Jasien requested from Silvers information about the financial aspects of CA West's workers' compensation insurance.  Silvers did not respond to Jasien, but instead forwarded Jasien's e-mail to Feldman, Silvers's co-conspirator.

b.	In a September 13, 2011 e-mail, Silvers falsely stated to Empire Controller Jasien that no workers' compensation premium refunds would be forthcoming from the insurance carrier because the company had "*another bad claim year*."  (Emphasis added).  A true and correct copy of this e-mail is attached as Exhibit 23.  In fact, refunds were paid but Silvers and Feldman diverted them to Pioneer.

72.	When, prior to filing the MAICO Complaint, MAICO sought to recover sums allegedly owed by CA West and Flooring Install based on audits and/or retrospective adjustments conducted by MAICO, Silvers kept this matter hidden from Empire's Board of Managers and its in-house counsel because, had he disclosed this information, the fact that he and Feldman, through Pioneer, had retained prior premium refunds would have likely been revealed.

73.	The scheme devised by Silvers and Feldman was capable of concealment because the money originally paid out by Empire for workers' compensation premiums was paid in the ordinary course of business.  Because Silvers and Feldman hid from Empire the fact that any premium refunds were forthcoming, there did not appear to be any impropriety on Empire's books (e.g., as would be apparent when money on the books simply vanishes).

74.	Silvers and Feldman were able to use their positions as CEO and CFO, respectively, to minimize scrutiny of their activities and to direct the payment of money in furtherance of their scheme.

**In A Fraudulent Effort to Cover-Up Their Scheme,
Silvers and Feldman Created And Distributed Two Phony Contracts**

75. Silvers and Feldman misrepresented Pioneer's right to receive workers' compensation premium refunds from MAICO. Silvers, in conjunction with Feldman, created two fictitious documents, each with a falsified signature page, purporting to contain CA West's authorization for workers' compensation premium refunds to be paid to Pioneer. Silvers provided one version of the falsified document to Empire's in-house counsel knowing that she would provide the document, at its request, to Empire's financial auditor, PricewaterhouseCoopers LLP. On information and belief, Silvers and/or Feldman distributed one or more versions of the falsified documents to others outside of Empire.

76. In March 2013 or sometime beforehand, Silvers took a valid and existing "Subcontractor Installer Agreement" between Empire and CA West, and (a) doctored it to state "Subcontractor *Insurance* Agreement" (emphasis added), (b) added Pioneer as a party to the agreement, (c) changed the agreement to state that Pioneer was to arrange for insurance on behalf of CA West, and (d) added a signature from Jose Sandoval (the President of CA West) that Silvers fraudulently obtained from another agreement. Silvers created this fictitious document with the phony signature of Sandoval to make it appear as though CA West had agreed to Pioneer's role with respect to its workers' compensation insurance. In reality, neither Empire nor CA West had authorized Pioneer's involvement, and Sandoval had not actually signed the document. This first fictitious "Subcontractor Insurance Agreement" will be referred to hereafter as "Fictitious Contract #1." A copy of Fictitious Contract #1 is attached as Exhibit 24.

77. Fictitious Contract #1 stated that "[Pioneer] accepts all liability and risk and any and all benefits associated with . . . insurance and *may charge other expenses as determined by*

*the sole discretion of [Pioneer].*" (Exh. 24, Part I, ¶4) (emphasis added). On information and belief, Silvers shared Fictitious Contract #1 with others via mail, e-mail, or facsimile.

78. Later in March 2013, Silvers discussed changes to Fictitious Contract #1 with Feldman via e-mail. A true and correct copy of the e-mail exchange between Silvers and Feldman regarding this issue is attached as Exhibit 25. The e-mail from Feldman (Exh. 25) makes clear that he intended to put a "signature page" on a newly-created fictitious contract in March 2013—i.e., that he did not actually seek appropriate signatures on the document when created. Feldman's e-mail (Exh. 25) also makes clear that he intended to distribute the newly-created fictitious contract with others.

79. As reflected in their e-mail exchange (Exh. 25), Silvers and Feldman created a new fictitious contract, which will be referred to hereafter as Fictitious Contract #2. A copy of Fictitious Contract #2 is attached as part of Exhibit 26 (starting with the second page of the exhibit). As they explained in their e-mail exchange (Exh. 25), Silvers and Feldman, in consultation with each other, added to Fictitious Contract #2 a signature from Jose Sandoval obtained from another document (just as Silvers had done with Fictitious Contract #1). Thus, Silvers and Feldman falsely represented that Fictitious Contract #2 was executed by Sandoval on behalf of CA West effective in June 2008 (the date on the first page of Fictitious Contract #2), years prior to the actual 2013 creation of Fictitious Contract #2.

80. Fictitious Contract #2 falsely and fraudulently stated that Pioneer would be entitled to "*all dividends or overpayments of premiums that might be due [CA West].*" (Exh. 26, Part I, ¶4) (emphasis added). Silvers and/or Feldman distributed Fictitious Contract #2 to others via e-mail, mail, or facsimile.

81. Silvers and Feldman created Fictitious Contract #2 in response to MAICO's questions in early 2013 about why funds that should have rightfully been refunded to CA West (and ultimately to Empire) were diverted to Pioneer.

82. Silvers provided Fictitious Contract #2 to Empire's in-house counsel on August 1, 2013. (See Exh. 26, first page). Silvers did so in response to her request that he provide any agreement between Pioneer and Empire. Empire's counsel sought such documentation to fulfill a request from Empire's auditors and its outside counsel investigating the matters alleged in the MAICO Complaint, and she informed Silvers of this fact. Thus, when Silvers provided Fictitious Contract #2 to Empire's in-house counsel, he knew that she intended to provide it to Empire's auditors and outside counsel. (Exh. 26).

83. On information and belief, Feldman or Silvers provided Fictitious Contract #2 to MAICO in an effort to deflect the allegations that ultimately surfaced in the MAICO Complaint.

**Risk Partners Works In Concert With Silvers And Feldman To Effectuate The Fraudulent Scheme And To Conceal The Scheme From Empire**

84. Risk Partners was an integral player in the scheme to defraud Empire via diversion of workers' compensation premium refunds.

85. From the outset of the scheme in 2005, Risk Partners coordinated with Silvers and Feldman to effectuate the scheme. Notwithstanding the fact that Risk Partners knew that Empire and the Empire Contractors had paid initial workers' compensation premiums and would therefore be entitled to receive the benefit of any overpayment refunds, Risk Partners, in aid of the scheme, assisted in diverting those refunds to Pioneer for the ultimate benefit of Silvers and Feldman. Risk Partners played an integral role in ensuring that refunds were paid to Pioneer and not to the Empire Contractors (parties to whom Risk Partners owed a fiduciary duty).

86. Risk Partners actively and knowingly assisted Silvers and Feldman in concealing their scheme from Empire by, among other things, communicating with Silvers and Feldman via methods outside of normal Empire communication channels (e.g., via Silvers's and Feldman's personal e-mail accounts and home addresses, and meeting with Silvers and Feldman outside of Empire's offices).

87. Risk Partners provided critical assistance to Silvers and Feldman in establishing the captive through Arlington and associating the captive with Liberty Mutual Insurance Company.

88. For its part in aiding Silvers and Feldman in effectuating the scheme, Risk Partners received brokerage commissions as part of the pertinent insurance transactions.

89. On information and belief, Risk Partners was aware of the fact that Silvers and Feldman were providing inflated initial payroll estimates and had elected insurance from MAICO using an LDF, all of which inflated the up-front premiums.

**Silvers and Feldman Personally Profited Through Pioneer By Distributions From Pioneer To Its Members (Colorado and Heritage)**

90. Silvers and Feldman directed Risk Partners in New Jersey, Liberty Mutual/Arlington (in Pennsylvania or Bermuda), and MAICO (in Pennsylvania) to divert funds that should have been paid to the Empire Contractors (and ultimately to Empire) to Pioneer's Chase Bank account in Illinois.

91. Silvers and Feldman shared in the proceeds of Pioneer when distributions were made from Pioneer's bank account to Colorado (controlled by Silvers and his wife) and Heritage (controlled, at least in part, by Feldman). Silvers and Feldman arranged for the ill-gotten gains from Pioneer to be transferred via wire or other electronic means to bank accounts maintained by

Colorado and Heritage. Money channeled through Colorado and Heritage eventually made its way to Silvers and Feldman personally.

92. Silvers and Feldman engaged in their scheme at least partially during normal working hours while both were officers of Empire. They engaged in their scheme using Empire resources.

**Empire Has Been Damaged In Significant Ways
By The Scheme Of Silvers and Feldman In Concert With The Other Defendants**

93. As a result of the scheme of Silvers and Feldman, in conjunction with the other Defendants named herein, Empire has, among other things, lost over $5 million in insurance refunds. Empire has also been obliged to expend significant sums investigating the misconduct of Silvers and Feldman. These expenditures included attorneys' fees for Mayer Brown's investigation into the matter as well as the fees of the accounting firm retained to assess any potential impact on Empire's financial statements. Empire has also spent an enormous amount of time and internal resources in the investigation of this scheme.

94. This scheme also prompted MAICO to sue and obliged Empire to defend against that suit.

95. In addition, Empire was deprived of the honest services of Silvers and Feldman as CEO and CFO, respectively, while they schemed to divert money to themselves rather than working for the benefit of Empire.

**CA West and Flooring Install Have Also Been Injured By The Conduct Of The Defendants,
And They Have Assigned Their Claims To Empire**

96. The scheme of Silvers and Feldman, in concert with the other Defendants, also directly injured CA West and Flooring Install—two of the Empire Contractors that had the insurance contracts with Liberty Mutual and/or MAICO and the entities that would have been the initial recipients of the insurance refunds described herein.

97. Empire is the bona fide owner of the claims of CA West and Flooring Install on which part of this case is brought. Empire acquired title to such claims through assignments executed by CA West and Flooring Install. True and accurate copies of these assignments are attached hereto as Exhibits 27 and 28.[4] Per these assignments, Empire is entitled to prosecute claims in its own name on behalf of CA West and Flooring Install.

## COUNT I – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT, 18 U.S.C. §§1961-68 – SILVERS, FELDMAN, COLORADO, HERITAGE, AND RISK PARTNERS

98. Empire incorporates and realleges Paragraphs 1 through 97 of the Complaint as if fully set forth herein.

99. At all times relevant hereto, Silvers, Feldman, Colorado, and Heritage (the "RICO Actors") and Risk Partners (the "RICO Co-Conspirator") have each been a "person," as that term is defined in 18 U.S.C. §1961(3).

100. Pioneer is an "enterprise" as defined by 18 U.S.C. §1961(4). Pioneer was engaged in interstate commerce at all times relevant to this Count.

101. Silvers and Feldman (on behalf of themselves and Colorado and Heritage) devised a scheme to defraud Empire of property (i.e., workers' compensation premium refunds) through Pioneer. In order to effectuate their scheme, Silvers and Feldman conspired with Risk Partners and made false representations to Liberty Mutual/Arlington, MAICO, and employees of Empire. The fraudulent scheme of Silvers and Feldman enriched them in excess of $5 million, to the detriment of Empire.

102. In violation of 18 U.S.C. §1962(c), the RICO Actors conducted or participated, directly or indirectly, in the conduct of Pioneer's affairs through a pattern of racketeering activity. Silvers and Feldman, through Colorado (controlled by Silvers) and Heritage (controlled

---

[4] The CA West Assignment Agreement contains a translation from English to Spanish.

by Feldman), are the sole members of Pioneer. Silvers and Feldman each participated consensually in making managerial decisions with respect to Pioneer and its activities in the scheme to defraud Empire. Sums of money fraudulently obtained by Pioneer were funneled to Silvers and Feldman through Colorado and Heritage.

103. Silvers and Feldman (individually and on behalf of Colorado and Heritage) committed, aided and abetted, and/or conspired to commit violations of the following provisions of the United States Code: 18 U.S.C. §1341 (mail fraud); and/or 18 U.S.C. §1343 (wire fraud).

104. Silvers and Feldman (individually and on behalf of Colorado and Heritage), for the purpose of executing their scheme to defraud Empire, transmitted or caused to be transmitted communications by means of (i) wire in interstate or foreign commerce (including telephone calls, facsimile transmissions, and e-mails), and/or (ii) mail (or private or commercial interstate carrier) beginning in 2005 and continuing until 2013—i.e., predicate acts under RICO. Such wire and mail communications by Silvers and Feldman for the purpose of executing their scheme to defraud Empire included, but were not limited to, the following:

  a. An e-mail sent by Silvers (in Illinois) to Elenowitz (in New York) on December 26, 2005 fraudulently omitting reference to the fact that Silvers, in conjunction with the other RICO Actors, had established a captive insurance company (with the aid and assistance of Risk Partners) (Exh. 20);

  b. A November 16, 2006 letter sent, on information and belief, via facsimile, by Silvers (in Illinois) to Liberty Mutual Group (in Pennsylvania) purportedly on behalf of Carpet Workshop but with a false address for Carpet Workshop (Silvers's home address), fraudulently instructing Liberty Mutual not to return premium refunds to Carpet Workshop but to instead retain the refunds "in the captive" for the ultimate benefit of the RICO Actors (Exh. 6);

  c. A March 31, 2008 facsimile from Silvers (in Illinois) to Arlington Insurance Company (in Bermuda) requesting a release of capital in the "Pioneer cell" (the captive) in the amount of $350,000—a release made possible because of refunds of premiums (originally paid by Empire) that had been deposited into the Pioneer cell (Exh. 7);

d.  An August 26, 2008 letter from Silvers and Feldman (in Illinois) mailed or sent via facsimile or e-mail to Arlington Insurance Company (in Bermuda) requesting a dividend from the captive insurance company—a dividend payment that was made possible because of premium overpayments deposited into the captive (Exh. 8);

e.  A November 7, 2008 letter sent via facsimile or e-mail from Silvers (in Illinois), using a false address for CA West, to Liberty Mutual Insurance Company (outside of Illinois) regarding workers' compensation insurance claims by CA West Flooring, Inc (Exh. 9);

f.  A January 8, 2009 letter sent by Silvers via facsimile or e-mail to Arlington Insurance Company in Bermuda fraudulently stating that any amounts distributed as a result of Carpet Workshop's workers' compensation policy "should be made through Pioneer Associates" (Exh. 10);

g.  A May 18, 2009 e-mail from Silvers (in Illinois) to Simon Hothersall (in Bermuda) seeking distributions to Pioneer based on sums that should have refunded to CA West or Carpet Workshop (Exh. 12);

h.  An April 8, 2010 letter from Silvers (in Illinois) to Melanie Neary (outside of Illinois) sent via e-mail or facsimile requesting commutation of the captive cell, which would allow the release of funds in the cell to Pioneer—funds that had been received based on workers' compensation premium overpayments from CA West and Carpet Workshop (funded by Empire) (Exh. 13);

i.  A May 7, 2010 letter from Feldman (in Illinois) to Arlington Insurance Company (in Bermuda) sent via mail, facsimile, or e-mail, requesting a distribution from the captive (funds that should have been returned to Empire via CA West or Carpet Workshop) (Exh. 14);

j.  A June 1, 2010 letter from Feldman (in Illinois) to Arlington Insurance Company (in Bermuda) sent via mail, facsimile, or e-mail, agreeing to commutation of the captive, with the attendant result that money in the captive (that should have been returned to Empire via CA West or Carpet Workshop) would be distributed to Pioneer (Exh. 15); and

k.  An October 4, 2011 e-mail from Silvers (in Illinois) to Sandi Funk of MAICO (in Pennsylvania) directing a wire transfer by MAICO to Pioneer's Chase Bank account in Illinois for the purpose of defrauding Empire of workers' compensation refunds due to Empire (Exh. 16).

105.  On information and belief, Silvers and Feldman (both in Illinois) distributed

Fictitious Contract #1 and/or Fictitious Contract #2 via e-mail or facsimile to Risk Partners (in

New Jersey) and/or MAICO (in Pennsylvania) in 2013. Additionally, on information and belief, beginning in 2005 and continuing through at least 2011, Silvers and Feldman (both in Illinois) had multiple telephone conversations with Ron Hodge of Risk Partners (in New Jersey) in furtherance of their scheme. Furthermore, Silvers and/or Feldman provided inflated payroll data to Liberty Mutual/Arlington and/or MAICO in an effort to ensure that initial premiums paid by Empire based on these estimates would result in large dollar refunds to Pioneer.

106. The transmission of interstate communications by wire or mail to effectuate the above-described scheme to defraud Empire, which occurred on more than one occasion in the past ten years, constitutes, for purposes of this action, a pattern of racketeering activity in violation of 18 U.S.C. §1962.

107. The pattern of racketeering activity engaged in by Silvers and Feldman (individually and on behalf of Colorado and Heritage) caused injury not only to Empire, but also to Carpet Workshop, CA West, Flooring Install, MAICO, and others. For example, MAICO has alleged injuries as set forth in the MAICO Complaint.

108. Empire has been injured by the pattern of racketeering activity. Among other things, Empire was deprived of workers' compensation insurance refunds in excess of $5 million.

109. The RICO Actors conspired to violate 18 U.S.C. §1962(c), which is itself a violation of 18 U.S.C. §1962(d). The RICO Actors agreed to participate in the affairs of Pioneer through a pattern of racketeering activity and agreed that the pattern of racketeering activity described herein would be committed by the RICO Actors on behalf of the conspiracy.

110. Risk Partners (the RICO Co-Conspirator) also conspired with the RICO Actors to violate 18 U.S.C. §1962(d).

111. Specifically, in furtherance of the conspiracy, Risk Partners agreed to (and did):

    a. Help Silvers and Feldman conceal the scheme from Empire and the Empire Contractors by communicating with Silvers and Feldman via personal e-mail accounts and home addresses and meeting with them off of Empire's premises;

    b. Facilitate the transfer to Pioneer of large sums of money that had been refunded from the insurers based on premiums originally paid by the Empire Contractors (and Empire);

    c. Coordinate the applicable insurance coverage that was a necessary component of the scheme;

    d. Assist Silvers and Feldman in providing inflated payroll estimates to the applicable insurance carriers and in arranging for insurance coverage for the Empire Contractors using an LDF, all of which resulted in greater up-front payments by Empire and larger refunds for Pioneer to misappropriate; and

    e. Assist Silvers and Feldman in establishing the captive through Liberty Mutual/Arlington Insurance Company knowing that Silvers and Feldman would profit from this endeavor, through Pioneer, to the detriment of Empire and the Empire Contractors.

112. Risk Partners agreed to participate in the affairs of Pioneer through a pattern of racketeering activity and agreed that the pattern of racketeering activity described herein would be committed by the RICO Actors on behalf of the conspiracy. Risk Partners understood and agreed that the RICO Actors would commit such acts in fulfillment of the scheme to defraud Empire.

113. Pursuant to 18 U.S.C. §1964(c), Empire is entitled to assert this RICO claim and recover threefold the damages it has sustained and the costs of suit, including reasonable attorneys' fees.

114. As a result of the actions of the RICO Actors and the RICO Co-Conspirator, Empire, for itself and as assignee of Flooring Install and CA West, has been damaged in a total amount to be determined at trial. Based on the misappropriated insurance refunds in excess of

$5 million and the over $1 million expended by Empire in addressing the ramifications of the scheme described herein, treble damages exceed $18 million.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendants Silvers, Feldman, Colorado, Heritage, and Risk Partners as follows:

(a)     For treble compensatory damages in an amount to be determined at trial;

(b)     For reasonable attorneys' fees and costs;

(c)     For prejudgment interest; and

(d)     For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

### COUNT II – BREACH OF CONTRACT – SILVERS

115.    Empire incorporates and realleges Paragraphs 1 through 114 of the Complaint as if fully set forth herein.

116.    The Silvers Employment Agreement was a valid and enforceable contract between Empire and Silvers supported by consideration in the form of, among other things, the mutual promises of the parties.

117.    Empire performed all of its promises under the Silvers Employment Agreement.

118.    Silvers breached his promises in Section 3 of the Silvers Employment Agreement by failing to:

a.      "[P]erform his duties and responsibilities in a diligent, careful, and proper manner";

b.      "[D]evote all of his business time and efforts to [Empire's] interests";

c.      "[G]ive his undivided professional loyalty to [Empire]"; and

d.      "Comply with the policies of [Empire] as in effect from time to time," including, but not limited to, its Code of Conduct."

(Exh. 1, §3).

119.     Empire's Code of Conduct states, among other things:

  a.     That leaders at Empire must set an example of honesty;

  b.     That Empire employees must fully comply with all applicable laws, rules and regulations;

  c.     That business records must not be falsified, that all financial transactions must be recorded on Empire's books, and that no unauthorized payments or transactions shall occur;

  d.     That outside employment and activities must not interfere with work at Empire;

  e.     That all payments and transfers to associates of other business entities or to such entities themselves must be made openly and must be disclosed and authorized in advance by Empire;

  f.     That every employee must safeguard Empire's property from loss or theft and may not appropriate such property for personal use;

  g.     That Empire's assets are to be used for legitimate business purposes only and not for personal use;

  h.     That Empire employees must avoid all conflicts of interest; and

  i.     That all activities conducted as an employee of Empire must be lawful and maintain the legitimate interests of Empire over personal gain.

A true and correct copy of Empire's Company Policy Manual, which includes the Code of Conduct on pages 12 to 16, is attached as Exhibit 29. Silvers violated the provisions of the Code of Conduct, which is a violation of the Silvers Employment Agreement.

120.     The Silvers Employment Agreement provides for an award of attorneys' fees and costs to the prevailing party in any action for breach of the Agreement. (Exh. 1, §10(b); Exh. 2, §10(b)).

121.     As a result of the actions of Silvers, Empire has suffered damage in an amount to be determined at trial.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendant Silvers as follows:

(a)     For compensatory damages in an amount to be determined at trial;

(b)     For reasonable attorneys' fees and costs pursuant to §10(b) of the Silvers Employment Agreement;

(c)     For prejudgment interest; and

(d)     For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

### COUNT III – BREACH OF CONTRACT – FELDMAN

122.     Empire incorporates and realleges Paragraphs 1 through 121 of the Complaint as if fully set forth herein.

123.     The Feldman Employment Agreement was a valid and enforceable contract between Empire and Feldman supported by consideration in the form of, among other things, the mutual promises of the parties.

124.     Empire performed all of its promises under the Feldman Employment Agreement.

125.     Feldman breached his promises in Section 3 of the Feldman Employment Agreement by failing to:

a.     "[P]erform his duties and responsibilities in a diligent, careful, and proper manner";

b.     "[D]evote all of his business time and efforts to [Empire's] interests";

c.     "[G]ive his undivided professional loyalty to [Empire]"; and

d.     "Comply with the policies of [Empire] as in effect from time to time," including, but not limited to, its Code of Conduct."

(Exh. 2, §3).

126.     Empire's Code of Conduct states, among other things:

- 36 -

a. That leaders at Empire must set an example of honesty;

b. That Empire employees must fully comply with all applicable laws, rules and regulations;

c. That business records must not be falsified, that all financial transactions must be recorded on Empire's books, and that no unauthorized payments or transactions shall occur;

d. That outside employment and activities must not interfere with work at Empire;

e. That all payments and transfers to associates of other business entities or to such entities themselves must be made openly and must be disclosed and authorized in advance by Empire;

f. That every employee must safeguard Empire's property from loss or theft and may not appropriate such property for personal use;

g. That Empire's assets are to be used for legitimate business purposes only and not for personal use;

h. That Empire employees must avoid all conflicts of interest; and

i. That all activities conducted as an employee of Empire must be lawful and maintain the legitimate interests of Empire over personal gain.

A true and correct copy of Empire's Company Policy Manual, which includes the Code of Conduct on pages 12 to 16, is attached as Exhibit 29. Feldman violated the provisions of the Code of Conduct, which is a violation of his Employment Agreement.

127. The Feldman Employment Agreement provides for an award of attorneys' fees and costs to the prevailing party in any action for breach of the Agreement. (Exh. 2, §10(b)).

128. As a result of the actions of Feldman, Empire has suffered damage in an amount to be determined at trial.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendant Feldman as follows:

(a) For compensatory damages in an amount to be determined at trial;

(b)     For reasonable attorneys' fees and costs pursuant to §10(b) of the Feldman Employment Agreement;

(c)     For prejudgment interest; and

(d)     For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

## COUNT IV – BREACH OF FIDUCIARY DUTY – SILVERS AND FELDMAN

129.    Empire incorporates and realleges Paragraphs 1 through 128 of the Complaint as if fully set forth herein.

130.    As Chief Executive Officer of Empire, Silvers owed Empire a fiduciary duty of loyalty to act in Empire's best interests at all times.

131.    Likewise, as Chief Financial Officer of Empire, Feldman owed Empire a fiduciary duty of loyalty to act in Empire's best interests at all times.

132.    In breach of their fiduciary duties to Empire, Silvers and Feldman actively managed a scheme to divert millions of dollars to themselves instead of Empire and actively concealed that scheme from Empire and its Board.

133.    Silvers and Feldman fraudulently concealed their scheme from Empire.  As a result, Empire did not discover the scheme until August 2013.

134.    Feldman and Silvers allowed each other to continue to be paid by Empire despite their knowledge of the scheme.  As recently as July 31, 2013, Silvers knowingly allowed a payment to Feldman of $466,432 for equity units despite knowing that Feldman had taken millions of dollars that should have been paid to Empire.

135.    Insofar as Silvers and Feldman devoted working time and effort toward their scheme, they denied Empire the benefit of that time and effort.

136. As a result of the actions of Silvers and Feldman, Empire has suffered damages in a total amount to be determined at trial.

137. Because Silvers and Feldman breached their fiduciary duties to Empire, the company is entitled to receive, as a remedy, disgorgement of all remuneration earned by Silvers and Feldman (including salary, bonus, equity units, and all other forms of compensation) throughout the inclusive time period during which Silvers and Feldman operated Pioneer to the detriment of Empire. This remuneration exceeds $4 million for Silvers and $3 million for Feldman.

138. The actions of Silvers and Feldman were willful, malicious, and done with reckless indifference to the rights of Empire.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendants Silvers and Feldman as follows:

(a) For compensatory damages in an amount to be determined at trial;

(b) For an order requiring Silvers to disgorge and forfeit all remuneration earned by him (including salary, bonus, equity units, and all other forms of compensation) from Empire throughout the inclusive time period during which Silvers operated Pioneer to the detriment of Empire and diverted workers' compensation premium refunds to Pioneer;

(c) For an order requiring Feldman to disgorge and forfeit all remuneration earned by him (including salary, bonus, equity units, and all other forms of compensation) from Empire throughout the inclusive time period during which Feldman operated Pioneer to the detriment of Empire and diverted workers' compensation premium refunds to Pioneer;

(d) For punitive damages in an amount to be determined at trial;

(e) For prejudgment interest; and

(f) For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

<u>**COUNT V – FRAUD (MISREPRESENTATION**</u>
<u>**AND OMISSION) - SILVERS AND FELDMAN**</u>

139.    Empire incorporates and realleges Paragraphs 1 through 138 of the Complaint as

if fully set forth herein.

140.    Silvers and Feldman falsely stated material facts to Empire or omitted stating

material facts to Empire in connection with their scheme to divert workers' compensation

premium refunds to themselves.  Among other things, as detailed in Paragraphs 34, 39-40, 42-43,

46, 49-53, 55-57, 59-60, 62-72, 75-82, and 90 above:

a.    Silvers misled the Chairman of Empire's Board of Managers into believing that Silvers and Feldman had not created a captive insurance company related to workers' compensation insurance;

b.    Silvers and Feldman artificially inflated payroll estimates and provided those estimates to both Empire and to the applicable workers' compensation insurance carriers so that the refunds that would occur (and that would be diverted to Pioneer) would be greater;

c.    Silvers and Feldman created Fictitious Contract #1 and Fictitious Contract #2, and Silvers provided Fictitious Contract #2 to Empire's in-house counsel knowing that she intended to provide it to Empire's financial auditors;

d.    Silvers omitted material information in his D&O Questionnaire that Empire relied upon in conjunction with its note offering;

e.    Feldman omitted material information in his D&O Questionnaire that Empire relied upon in conjunction with its note offering;

f.    Silvers and Feldman concealed from Empire each and every receipt by Pioneer of sums related to workers' compensation premium refunds for the Empire Contractors;

g.    Silvers misrepresented to Controller Bill Jasien that no premium refunds would be forthcoming because of a purported "bad claim year"; and

h.    Silvers concealed the pre-litigation claims of MAICO, and his ongoing efforts to resolve the threatened claims, that were ultimately revealed in the MAICO Complaint.

141. Silvers and Feldman knew that their statements were untrue and that they had concealed material facts from Empire.

142. Silvers and Feldman made their false statements to Empire and concealed material facts from Empire in order to perpetuate their scheme to divert workers' compensation insurance refunds to themselves without detection from Empire.

143. Empire had a right to rely on the representations of Silvers and Feldman and did, in fact, rely on those representations. Empire was unaware of any omissions by Silvers and Feldman until their scheme was revealed during Empire's investigation into the allegations of the MAICO Complaint.

144. Silvers and Feldman fraudulently concealed their scheme from Empire, and, as a result, Empire did not discover their scheme until August 2013.

145. Empire's reliance on the false statements of Silvers and Feldman and the omissions of Silvers and Feldman has caused Empire damages in a total amount to be determined at trial.

146. The actions of Silvers and Feldman were willful, malicious, and done with reckless indifference to the rights of Empire.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendants Silvers and Feldman as follows:

(a) For compensatory damages in an amount to be determined at trial;

(b) For punitive damages in an amount to be determined at trial;

(c) For prejudgment interest; and

(d) For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

## COUNT VI – TORTIOUS INTERFERENCE
## WITH FIDUCIARY RELATIONSHIP – SILVERS

147.  Empire incorporates and realleges Paragraphs 1 through 146 of the Complaint as if fully set forth herein.

148.  Silvers knew that Feldman had a fiduciary duty of loyalty to Empire.

149.  Silvers intentionally and unjustifiably induced Feldman to breach his duty of loyalty to Empire.

150.  Silvers benefitted from Feldman's breach of his fiduciary duty of loyalty to Empire.

151.  Silvers fraudulently concealed from Empire the scheme to divert workers' compensation premium refunds to Pioneer and ultimately to himself and Feldman. As a result, Empire did not discover the scheme until August 2013.

152.  As a result of the actions of Silvers in inducing Feldman to breach his fiduciary duty of loyalty, Empire has suffered damages in a total amount to be determined at trial.

153.  The actions of Silvers were willful, malicious, and done with reckless indifference to the rights of Empire.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendant Silvers as follows:

(a)  For compensatory damages in an amount to be determined at trial;

(b)  For punitive damages in an amount to be determined at trial;

(c)  For prejudgment interest; and

(d)  For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

## COUNT VII – TORTIOUS INTERFERENCE WITH
## FIDUCIARY RELATIONSHIP – FELDMAN

154. Empire incorporates and realleges Paragraphs 1 through 153 of the Complaint as if fully set forth herein.

155. Feldman knew that Silvers had a fiduciary duty of loyalty to Empire.

156. Feldman intentionally and unjustifiably induced Silvers to breach his duty of loyalty to Empire.

157. Feldman benefitted from Silvers's breach of his fiduciary duty of loyalty to Empire.

158. Feldman fraudulently concealed from Empire the scheme to divert workers' compensation premium refunds to Pioneer and ultimately to himself and Silvers. As a result, Empire did not discover the scheme until August 2013.

159. As a result of the actions of Feldman in inducing Silvers to breach his fiduciary duty of loyalty, Empire has suffered damages in a total amount to be determined at trial.

160. The actions of Feldman were willful, malicious, and done with reckless indifference to the rights of Empire.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendant Feldman as follows:

(a) For compensatory damages in an amount to be determined at trial;

(b) For punitive damages in an amount to be determined at trial;

(c) For prejudgment interest; and

(d) For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

## COUNT VIII – UNJUST ENRICHMENT – SILVERS, FELDMAN, PIONEER, COLORADO, AND HERITAGE

161. Empire incorporates and realleges Paragraphs 1 through 160 of the Complaint as if fully set forth herein.

162. Silvers, Feldman, Pioneer, Colorado, and Heritage have unjustly retained the money paid to them as a result of refunds related to insurance premiums originally funded by Empire through the Empire Contractors.

163. The retention of this money by Silvers, Feldman, Pioneer, Colorado, and Heritage violates the fundamental principles of justice, equity, and good conscience.

164. Silvers, Feldman, Pioneer, Colorado, and Heritage fraudulently concealed from Empire the scheme to divert workers' compensation insurance refunds to Pioneer and then to Colorado and Heritage and then to Silvers and Feldman. As a result, Empire did not discover the scheme until August 2013.

165. As a result of the actions of Silvers, Feldman, Pioneer, Colorado, and Heritage, Empire, for itself and as assignee of Flooring Install and CA West, has suffered damages in a total amount to be determined at trial. As assignee of CA West and Flooring Install, Empire is entitled to assert this claim on their behalf.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendants Silvers, Feldman, Pioneer, Colorado, and Heritage as follows:

(a) For compensatory damages in an amount to be determined at trial;

(b) For prejudgment interest; and

(c) For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

**COUNT IX – CIVIL CONSPIRACY – SILVERS, FELDMAN, AND RISK PARTNERS**

166. Empire incorporates and realleges Paragraphs 1 through 165 of the Complaint as if fully set forth herein.

167. Silvers and Feldman, in concert with Risk Partners, knowingly entered into an agreement to defraud Empire of insurance refunds.

168. In furtherance of this conspiracy, Silvers and Feldman fraudulently misrepresented many things to Empire, including, but not limited to, the misrepresentations and omissions set forth in Paragraphs 34, 39-40, 42-43, 46, 49-53, 55-57, 59-60, 62-72, 75-82, 90, and 146 above. Risk Partners aided Silvers and Feldman in ensuring the concealment of the scheme.

169. Silvers, Feldman, and Risk Partners fraudulently concealed their scheme from Empire. As a result, Empire did not discover the scheme until August 2013.

170. In furtherance of their conspiracy, Silvers and Feldman, in concert with Risk Partners, committed theft (in violation of 720 ILCS 5/16-1(a)(1)) by defrauding Empire of insurance refunds due and owing to Empire, for itself and as assignee of Flooring Install and CA West.

171. As a result of the conduct of Silvers, Feldman, and Risk Partners, Empire, for itself and as assignee of Flooring Install and CA West, has been damaged in an amount to be determined at trial. As assignee of CA West and Flooring Install, Empire is entitled to assert this claim on their behalf.

172. The actions of Silvers, Feldman, and Risk Partners were willful, malicious, and done with reckless indifference to the rights of Empire, itself and as assignee of Flooring Install and CA West.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendants Silvers, Feldman, and Risk Partners as follows:

(a)     For compensatory damages in an amount to be determined at trial;

(b)     For punitive damages in an amount to be determined at trial;

(c)     For prejudgment interest; and

(d)     For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

<b><u>COUNT X – TORTIOUS INTERFERENCE WITH CONTRACT –<br>SILVERS, FELDMAN, AND PIONEER</u></b>

173. Empire incorporates and realleges Paragraphs 1 through 172 of the Complaint as if fully set forth herein.

174. Empire was a third-party beneficiary of the contracts for workers' compensation insurance between the Empire Contractors (on the one hand) and Liberty Mutual Insurance Company and MAICO (the "Insurers") (on the other hand) by virtue of the fact that Empire paid the sums to the Empire Contractors for the workers' compensation premiums they initially incurred. Empire, as third-party beneficiary, was entitled to receive refunds based on premiums that it had originally paid through the Empire Contractors.

175. Flooring Install and CA West are parties to contracts for workers' compensation insurance with MAICO. CA West was also a party to an insurance contract with Liberty Mutual Insurance Company. Flooring Install and CA West were entitled to receive refunds under these insurance policies.

176. The insurance agreements between the Empire Contractors and the Insurers are valid and enforceable agreements.

177. Silvers, Feldman, and Pioneer were aware of the existence of the insurance agreements.

178. Silvers and Feldman (acting outside of the scope of their legitimate authority as Empire officers), along with Pioneer, intentionally and unjustifiably interfered with the insurance agreements by having the Insurers divert refunds to Pioneer instead of to the Empire Contractors.

179. Despite their knowledge of the relevant insurance agreements, Silvers, Feldman, and Pioneer induced the Insurers to breach their insurance agreements with the Empire Contractors by failing to return premium refunds to the Empire Contractors (for further disbursement back to Empire, the third-party beneficiary of the insurance agreements).

180. Silvers, Feldman, and Pioneer fraudulently concealed from Empire their scheme to divert workers' compensation premium refunds to Pioneer (and ultimately to Silvers and Feldman). As a result, Empire did not discover the scheme until August 2013.

181. As a result of the actions of Silvers, Feldman, and Pioneer, Empire, for itself and as assignee of Flooring Install and CA West, has been damaged in an amount to be determined at trial. As assignee of CA West and Flooring Install, Empire is entitled to assert this claim on their behalf.

182. The actions of Silvers, Feldman, and Pioneer were willful, malicious, and done with reckless indifference to the rights of Empire, itself and as assignee of Flooring Install and CA West.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendants Silvers, Feldman, and Pioneer as follows:

(a)      For compensatory damages in an amount to be determined at trial;

(b)      For punitive damages in an amount to be determined at trial;

(c)      For prejudgment interest; and

(d)      For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

### COUNT XI – TORTIOUS INTERFERENCE WITH CONTRACT – RISK PARTNERS

183. Empire incorporates and realleges Paragraphs 1 through 182 of the Complaint as if fully set forth herein.

184. Empire was a third-party beneficiary of the contracts for workers' compensation insurance between the Empire Contractors (on the one hand) and the Insurers (on the other hand) by virtue of the fact that Empire paid the sums to the Empire Contractors for the workers' compensation premiums they initially incurred. Empire, as third-party beneficiary, was entitled to receive refunds based on premiums that it had originally paid through the Empire Contractors.

185. Flooring Install and CA West are parties to contracts for workers' compensation insurance with MAICO. CA West was also a party to an insurance contract with Liberty Mutual Insurance Company. Flooring Install and CA West were entitled to receive refunds under these insurance policies.

186. The insurance agreements between the Empire Contractors and the Insurers are valid and enforceable agreements.

187. Risk Partners was aware of the existence of the insurance agreements, and, indeed, facilitated their execution.

188. Risk Partners intentionally and unjustifiably interfered with the insurance agreements by having the Insurers divert refunds to Pioneer instead of remitting the funds to the Empire Contractors, who were contractually entitled to them.

189. Despite its knowledge of the relevant insurance agreements and the Insurers' obligations to the Empire Contractors, Risk Partners induced the Insurers to breach their insurance agreements with the Empire Contractors by failing to return premium refunds to the Empire Contractors (for further disbursement back to Empire, the third-party beneficiary of the insurance agreements).

190. Risk Partners fraudulently concealed from Empire the diversion of workers' compensation premium refunds to Pioneer. As a result, Empire did not discover the diversion until August 2013.

191. As a result of the actions of Risk Partners, Empire, for itself and as assignee of CA West and Flooring Install, has been damaged in an amount to be determined at trial. As assignee of CA West and Flooring Install, Empire is entitled to assert this claim on their behalf.

192. The actions of Risk Partners were willful, malicious, and done with reckless indifference to the rights of Empire, itself and as assignee of CA West and Flooring Install.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendant Risk Partners as follows:

(a)     For compensatory damages in an amount to be determined at trial;

(b)     For punitive damages in an amount to be determined at trial;

(c)     For prejudgment interest; and

(d)     For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

## COUNT XII – TORTIOUS INTERFERENCE
## WITH FIDUCIARY RELATIONSHIP – RISK PARTNERS

193. Empire incorporates and realleges Paragraphs 1 through 192 of the Complaint as if fully set forth herein.

194. Risk Partners knew that Silvers and Feldman each had a fiduciary duty of loyalty to Empire.

195. Risk Partners intentionally and unjustifiably induced Silvers and Feldman to breach their duties of loyalty to Empire.

196. Risk Partners benefitted from Silvers's and Feldman's breach of their fiduciary duty of loyalty to Empire through, among other things, receipt of brokerage commissions.

197. Risk Partners fraudulently concealed from Empire the diversion of workers' compensation premium refunds to Pioneer. As a result, Empire did not discover the diversion until August 2013.

198. As a result of the actions of Risk Partners in inducing Silvers and Feldman to breach their fiduciary duty of loyalty, Empire has suffered damages in a total amount to be determined at trial.

199. The actions of Risk Partners were willful, malicious, and done with reckless indifference to the rights of Empire.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendant Risk Partners as follows:

(a) For compensatory damages in an amount to be determined at trial;

(b) For punitive damages in an amount to be determined at trial;

(c) For prejudgment interest; and

(d) For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

### COUNT XIII – AIDING AND ABETTING FRAUD – RISK PARTNERS

200. Empire incorporates and realleges Paragraphs 1 through 199 of the Complaint as if fully set forth herein.

201. Risk Partners aided and abetted Silvers and Feldman in the fraudulent scheme described herein. This scheme caused substantial injury to Empire.

202. Risk Partners knowingly played an integral role in assisting Silvers and Feldman fraudulently conceal the scheme from Empire and the Empire Contractors. As a result, Empire did not discover the scheme until August 2013.

203. As a result of the actions of Risk Partners, Empire has suffered damages in a total amount to be determined at trial.

204. The actions of Risk Partners were willful, malicious, and done with reckless indifference to the rights of Empire.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendant Risk Partners as follows:

(a) For compensatory damages in an amount to be determined at trial;

(b) For punitive damages in an amount to be determined at trial;

(c) For prejudgment interest; and

(d) For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

### COUNT XIV – BREACH OF FIDUCIARY DUTY – RISK PARTNERS

205. Empire incorporates and realleges Paragraphs 1 through 204 of the Complaint as if fully set forth herein.

206. Risk Partners, as an insurance broker to CA West and Flooring Install, owed a fiduciary duty to CA West and Flooring Install.

207. As an insurance broker, Risk Partners had knowledge superior to that of CA West and Flooring Install about insurance, including knowledge about the operation of captives and knowledge about how workers' compensation premiums are calculated and refunded on a retrospective basis.

208. As a result of Risk Partners's superior knowledge, CA West and Flooring Install placed trust and confidence in Risk Partners that they would not have otherwise done, resulting in Risk Partners being placed in a position of influence and superiority.

209. Risk Partners breached the fiduciary duties it owed to CA West when it: assisted Silvers and Feldman in utilizing inflated payroll estimates for initial premium payments and in arranging for insurance using an LDF; assisted Silvers and Feldman in establishing a captive for the benefit of Pioneer and not CA West; and refunded premium payments to Pioneer instead of to CA West.

210. Risk Partners breached the fiduciary duties it owed to Flooring Install when it: assisted Silvers and Feldman in utilizing inflated payroll estimates for initial premium payments and in arranging for insurance using an LDF; and refunded premium payments to Pioneer instead of to Flooring Install.

211. Risk Partners's breach of its fiduciary duties caused harm to CA West and Flooring Install.

212. Risk Partners fraudulently concealed from CA West and Flooring Install the diversion of workers' compensation premium refunds to Pioneer. As a result, CA West and Flooring Install did not discover the diversion until in or around September 2013.

213. As assignee of CA West and Flooring Install, Empire is entitled to assert this breach of fiduciary duty claim against Risk Partners.

214. As a result of the actions of Risk Partners, Empire, as assignee of CA West and Flooring Install, has suffered damages in a total amount to be determined at trial.

215. The actions of Risk Partners were willful, malicious, and done with reckless indifference to the rights of CA West and Flooring Install.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendant Risk Partners as follows:

(a)     For compensatory damages in an amount to be determined at trial;

(b)     For punitive damages in an amount to be determined at trial;

(c)     For disgorgement of commissions that Risk Partners received related to workers' compensation insurance for CA West and Flooring Install;

(d)     For prejudgment interest; and

(e)     For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

## COUNT XV – BREACH OF FIDUCIARY DUTY TO CA WEST AND FLOORING INSTALL – SILVERS

216. Empire incorporates and realleges Paragraphs 1 through 215 of the Complaint as if fully set forth herein.

217. As a director of CA West and Flooring Install during at least a portion of the relevant time period,[5] Silvers owed CA West and Flooring Install a fiduciary duty of loyalty.

---

[5] Silvers resigned as a director of CA West on June 30, 2009. Silvers was a director of Flooring Install as of at least November 13, 2009.

218. In breach of his fiduciary duty to CA West and Flooring Install, Silvers actively managed a scheme to divert insurance refunds to Pioneer and ultimately to himself instead of returning such sums to CA West and Flooring Install.

219. Silvers fraudulently concealed his scheme from CA West and Flooring Install. As a result, they did not discover the scheme until in or around September 2013.

220. As a result of the actions of Silvers, CA West and Flooring Install have suffered damages in a total amount to be determined at trial. As assignee of CA West and Flooring Install, Empire is entitled to assert this claim for damages on their behalf.

221. The actions of Silvers were willful, malicious, and done with reckless indifference to the rights of CA West and Flooring Install.

WHEREFORE, Plaintiff Empire Today, LLC respectfully requests that the Court enter a judgment in its favor and against Defendant Silvers as follows:

(a) For compensatory damages in an amount to be determined at trial;

(b) For punitive damages in an amount to be determined at trial;

(c) For prejudgment interest; and

(d) For such further relief as the Court deems just and proper.

Empire demands a jury for those elements of this Count suitable for jury determination.

Respectfully submitted,

EMPIRE TODAY, LLC


By: _____/s/ Kevin D. Kelly_____
One of Its Attorneys

Kevin D. Kelly
Katherine Heid Harris
Locke Lord LLP
111 South Wacker Drive, Suite 4300
Chicago, Illinois  60606
312/443-0700

## INDEX OF EXHIBITS

1      Silvers Employment Agreement

2      Feldman Employment Agreement

3      MAICO Complaint

4      West Virginia Corporate Records pertaining to Pioneer Associates, LLC

5      West Virginia Corporate Records pertaining to Colorado Future Enterprises, LLC

6      November 2006 Facsimile sent by Silvers to Liberty Mutual Insurance Company in Pennsylvania

7      March 2008 Facsimile sent by Silvers and Feldman to Arlington in Bermuda

8      August 2008 Letter on Pioneer Letterhead sent Silvers and Feldman

9      November 2008 Letter to Liberty Mutual Insurance Company sent by Silvers

10     January 2009 Letter to Arlington sent by Silvers

11     March 28, 2009 Email from Feldman to Silvers regarding MAICO Audit Request

12     May 2009 Email to Simon Hothersall of Liberty Mutual Management (Bermuda) Limited sent by Silvers

13     April 8, 2010 Letter sent by Silvers, on behalf of Pioneer, to Liberty Mutual/Arlington

14     May 7, 2010 Letter sent by Feldman, on behalf of Pioneer, to Arlington

15     June 1, 2010 Letter sent by Feldman, on behalf of Pioneer to Arlington

16     July 16, 2010 Confirmation Email Received by Silvers

17     October 4, 2011 Email Sent by Silvers Providing Wire Transfer Information

18     Silvers D & O Questionnaire

19     Feldman D & O Questionnaire

20     December 2005 Email from Silvers to Chairman of Empire's Board of Managers, David Elenowitz

21     June 23, 2006 Email from Silvers to Certain Empire Personnel

22     May 2007 Email from Silvers to Scott Bergfors, an Empire Manager

23      September 13, 2011 Email sent by Silvers to Empire Controller Jasien

24      Fictitious Contract #1

25      March 2013, Email sent by Silvers to Feldman

26      Fictitious Contract #2

27      CA West Flooring Assignment Agreement

28      Flooring Install Assignment Agreement

29      Empire's Company Policy Manual